Good morning, Your Honors, and may it please the Court, and excuse me, I'm apparently hoarse this morning. Melinda Ebelherr, appearing on behalf of the appellant, Michele Baker. Your Honors, as you're aware, this is a disability discrimination case brought under the ADA. In the very first instance, the District Court erred in applying or analyzing whether or not... No, it did. Okay. It was a summary judgment. So, what, then? Thank you. Then, having established that the Court erred in the way that it determined whether or not she was regarded as disabled under the applicable statute, we then turned to examining how that error infected the rest of the Court's analysis. Question A was, was this an impairment within the meaning of the statute? Yes, was this... Was it an impairment within the meaning of the amended statute? Within the meaning of the amendments, and that is a, that is a fact question based on the evidence that she submitted regarding having communicated to her principal her problems, having continuing headaches, dizziness, night vision. It is at least a tribal issue of fact. Now, then, of course, having established that, there is the causation question, which the District Court did not analyze, having assumed that there was no disability, so we didn't need to analyze the causation issue in the first place. The Court did analyze the question of pretext after the, the respondent school had submitted evidence, primarily in the form of a series of performance evaluations, suggesting that the lady was fired, or, excuse me, her contract was not renewed after 14 years for performance reasons. The same evidence that we submitted regarding causation also supports pretext, and, of course, case law is clear that we can do that, and the reason that it does, there are a couple of reasons as to why there is pretext shown on this. So what's, what's your best evidence? I, I do think that the pretext question, the question of, of whether you've established a prima facie case are very, very closely related. I think you rely on largely the same evidence for both of those. That's right. So, so what is, what is the principal evidence that she was fired because of her disability? Well, Your Honor, of course there's no direct evidence because nobody on the other side was transparent enough to say that. But there is evidence, circumstantial evidence, which can be strong evidence, which supports the inference, or that a, a reasonable trier of fact could draw the inference, and there's a couple of them. First off, there's the... Now, you're not arguing actual disability, or not really? You're arguing... On appeal, Your Honor, we're arguing regarded as. The EEOC argued that she was also actually disabled, but once you get one, it doesn't really matter which one you get, as long as you get one of the prongs under the statute. So in terms of, of pretext, Your Honor, we, first off, we have the Me Too evidence. Now the district court overruled the objections and considered the declarations regarding the Me Too evidence, but then because the trial, the district court erroneously thought that as a matter of law, she was no longer disabled as of the day she returned to work, it eliminated the... This is Slotinoff and Kressel? Yes, Your Honor. And these are the people who said, I, too, experienced a disability, and I, too, was fired, or my contract was not renewed. Did either of them bring any claims against the school? That's not in the record, Your Honor, and I don't know the answer to that. But it's not in their declarations that they did, or that it's been adjudicated any place? That's correct, Your Honor. If that was let in, this would require a full, sort of a trial within a trial, wouldn't it? Your Honor, I think that it would... I think not. I think what happens is you put those witnesses on the stand, that probably an objection to their opinion as to why they were fired is sustained, but that they are able to get up there, and they're able to say, I experienced this disability. I reported it to Mr. Dealey. Mr. Dealey treated me different after that. Mr. Dealey did not renew my contract after that. And in one case, one of those people also says, Mr. Dealey also told me, as he apparently told Ms. Baker, that there were numerous complaints about me from parents and other people, but he refused to show me any documentation from that. So there's a pattern happening within a couple of years of each other, where somebody experiences a problem on campus that leads to a disability, and then he does not accommodate that disability, or he treats them differently after that, then he does not renew their contract, and he tells them, oh, there were lots of parents' complaints about you, but he has no documentation for that. It is the same thing that happened in our case, of course, where one of the justifications he offered for the refusal to renew her contract was, well, in seven years, I've had a dozen parent complaints about you. Well, do you have anything to document that? Well, no, I don't. Well, do you have anything to document any of the student complaints? Well, no, I don't. There comes a point, even under McGinst, which is from the Ninth Circuit, where if I talk about teachers and other principals and counselors who complained about her. Your Honor, there are... By name. They are by name. They are not documented. There is no shred of evidence in this record that shows that over the seven or eight or however many years he says he was receiving complaints from either parents, students, or counselors, there's nothing contemporaneous with any of those alleged complaints in the record. The first thing that we see is in that 2013 performance evaluation, where in a comment he says, Michelle, we've talked about parent complaints before and... Now, just explain why he decided to do this evaluation in January of 2013. Your Honor, he says, well, I was... I had been behind on my... In his declaration, he says, I had been behind on teacher evaluations because we had had the move, there had been expansion in enrollment, whatever, so I was trying to get caught up. Now, in the record... That's what he told her, but what he says in his declaration was that he received complaints. Well, yes, Your Honor, so he comes up with a couple of different reasons, I guess, depending on which one he likes best at the time. So you've got the Me Too evidence, and you've got timing. I've got timing, and Your Honor, then if you... Explore the timing. My understanding is the last evaluation is 2009. Yes, Your Honor. And the last evaluation before that is 2003, right? Yes, Your Honor, that's correct. And then she has the concussion in August of 2012, and it's in December of 2012 when he begins the evaluation, in January of 2013 that he completes it, correct? That is correct, Your Honor. So is that the timing you want us to consider? That is... Yes, Your Honor, that is the timing. In between there, she has the August 23 injury, she returns to work on September 3. In that period as well, in there, she files a worker's compensation claim, and she... And I thought I had the exact date of that filing, I don't have it, I apologize, but she's also taking off time from work for doctor's appointments, October 11th, October 25th, November 26th. And a week after December 26th, he says, Michele, I want to evaluate you. Was there, in the earlier evaluations, did the principal do the evaluations? Your Honor, in the 2009 evaluation, I think it was an assistant principal that did it, it was not Mr. Daley, and I believe that protocol allowed one or the other to do it. Right. But there's some interesting... The earlier ones was a different school, was that it? Your Honor, what happened was in the very early ones, in the 2000 period, it was the University of San Diego. And then the archdiocese closed that and opened Cathedral High School as basically a continuation of one to the other. So it's the same school under a different name but under the same archdiocese and with the same... In your view, was there a difference between the evaluation in January of 2013 and the other evaluations? A difference? Yes, Your Honor, I think there was. In fact, if you go over these evaluations, except for the 2001, which is on a different form, you can actually compare them across pretty carefully. There are 45 boxes that can be checked under each of the different standards. There's seven standards overall, 45 boxes. If you go back to the 2003 evaluation, of those 45 boxes, there were 34 ticked meets expectations, six ticked that it was actually an area of strength for her, and five that needed improvement. Now, in their answering brief, the diocese goes back and forth between the 2003 and the 2009 and the 2013 evaluations. But if you compare the 2003 to the 2013, you'll find that of those five areas where she was found to need improvement in 2003, only one of them remained to require improvement in 2013. If you compare, if you do that same box-by-box comparison between the 2009 and the 2013, you'll find that of, there were 17 boxes marked need improvement in the 2009 review, and yet for four years or three years, they continued to renew her contract and give her a raise. But you'll find of those 17, she improved in 13 of them. She raised them from area of growth needed to meets expectations, and in two of them, she actually bumped them up to an area of strength. So, to say that, well, she continued to exhibit the same problems and she didn't improve, whatever, that's not true, based on the objective evidence here. And that is another thing that goes to show pretext, because if they rely on something that is not true, then that is something a reasonable trier of fact could draw the conclusion that maybe there's something more going on here than that. The, excuse me, in order to, in order to make it seem like she was a worse teacher than these suggest, in the answering brief, they discuss only the broad eight standards and they don't go into each of the individual boxes and compare them with the previous, with the previous ones. One of the things they do point out is that, well, she did not open class with a prayer, and she got ticked on that for an area of growth. And yet, when you go to the very end, under meets, she met standards for complying with school policies, practices, and procedures. This seems contradictory and could be another thing that could be used to argue to a jury that this performance evaluation was really designed for something more than evaluating performance. Then you put around it the circumstances of it where it had been several years since she'd had a performance review, that she was handed the review along with her advisement that she wasn't going to be renewed for the following year at the she was going to be, that she needed to... But is there any policy of giving these warnings? Your Honor, there is a discrepancy in the record, excuse me, there's a diverse opinion in the record regarding this, okay? According to the Archdiocese, the faculty handbook makes no reference to that. According to Mr. Dealy, in his testimony, he said that he did follow a progressive progress that started with oral, went to written, and that he had a variety of other things that he could do, perhaps place someone on a suspension or advise them that he wasn't going to renew their contract if they did not improve their behavior. So there is a tribal issue fact as to whether or not there, in fact, was a progressive policy in that way. Do you have reserve time? I would like to, Your Honor. Thank you. Good morning, Your Honors. May it please the Court, my name is Scott Dixler and I represent the Roman Catholic Bishop of San Diego. Your Honors, I'd like to focus the Court's attention on a threshold requirement for Baker to prevail on her disability discrimination claim, and that's whether she was regarded as having an impairment, as that term is used under the amended ADA. The amended ADA doesn't define the term impairment, but the EEOC has promulgated a regulation that does, and that regulation, neither side disputes the validity of that regulation in this case. Under the EEOC's regulation, an impairment is defined as a physiological disorder or condition that affects a body system, and there's no evidence here, either that Principal Baker is having a physiological disorder or condition when the decision was made not to offer her a new contract. And for that reason alone, her claim fails and summary judgment was appropriate. Well, they knew that she was, that she'd had this fall, and they knew that she was continuing to report dizziness and headaches and so on, right? That's right. What they also knew, and this is in the record, is that Baker would periodically, and that's her word periodically, bump into Dealey on campus and tell him that she's suffering from headaches and dizziness. Isn't that classic post-concussive symptoms? Well, it might be, and Dealey did know Baker had mentioned a concussion at first, but there was no indication that Dealey or anyone else at the school thought that Baker had been diagnosed with post-concussive syndrome, suffered any sort of post-concussive problem. Headaches and dizziness are the sort of impairments that, well, they're not impairments, the sort of symptoms that any employee might complain of, and the focus of the regulation... Headaches, yes. Dizziness, less so. Well, maybe, but the focus of the regulation isn't on symptoms. The focus of the regulation is on disorders and conditions, and that has to be something more than just symptoms. So, again, taking the evidence in the light most favorable to Baker, the most that Dealey... The fact that he actually knew of the original incident and that she was continuing to have symptoms, those two things alone are not enough? I don't think so, Your Honor, because, again, had he been told, and it's important here also, she mentions that she was going to periodic doctor's appointments. Now, Dealey didn't know the details of them, but she did submit documents called work status reports to the school, and what those reports said is that she was cleared for work with absolutely no limitations. She testified that she had no limitations at all at her job. Dealey certainly had no reason to think she was afflicted with any sort of lingering condition or disorder. Quite the contrary. The most that the record supports is that he thought she had unspecified headaches and dizziness, and that is simply not enough to meet the regulatory requirement of a disorder or condition. Could you respond to the question about whether or not progressive discipline was followed as a matter of practice, whether Mr. Dealey said he did even though it wasn't in the handbook? Yes, Your Honor, and that, of course, goes to pretext rather than the threshold issue of whether she was regarded as disabled, but on that pretext point, of course, the handbook doesn't mention any sort of progressive discipline policy. Dealey, in his deposition, didn't mention a policy either. He just said that that is something that he would do on occasion, is that if there was an issue of teacher misconduct, at first, he could address it with verbal warnings and it could escalate to written warnings. He's talking about an actual practice as opposed to a policy. Right, he's talking about something that he could do, and the fact is- Did he follow the actual practice in her case? Well, in her case, the situation was different. The decision was made not to discipline her. The decision was made simply not to offer her a new employment contract. The way this school is organized is that each teacher is offered a one-year contract, and then the decision is made whether to offer a new contract, so it's a fresh decision. It's not a matter of discipline. It's a matter of whether a particular teacher meets the standards that the school expects and is offered a new contract for the academic year. So, for example, if there was a situation where teachers could be arguing in a hallway loudly or something, that might call for a verbal warning, but there's no indication that where teachers are having performance problems like this, a system of progressive discipline was used, because it's not a disciplinary issue. It's a performance issue. I'd like to turn back to the threshold disability question for a second. So, as I just said, there's no evidence in the record showing that Dealey or anyone else at the school perceived Baker to be impaired, but even if the court disagrees, Baker's claim still fails at the threshold, because any such perceived impairment was transitory and minor under the statute. The amended ADA is very clear. It's right in the text of the statute. There's a 42 U.S.C. 12-102, that transitory and minor... I'm sorry. Do you now agree that a district judge applies the wrong standard? Well, I think the district judge is a... I think big picture, he applied the right standard. He mentioned the amended ADA, and he acknowledged that. But he went on and on about... But he went on... I'm sorry. He went on about major life activities, and that was unfortunate. Did you argue that? Excuse me? The district court, how did you argue the case? Unfortunately, the briefing below did focus on the incorrect legal standard. Okay, so you never raised the arguments below that you're raising now about the fact that this wasn't an impairment, a proper impairment under the right standard? It wasn't focused on the proper standard, and that was unfortunate. But this court's review is de novo and can affirm on any grounds supported in the record. And the district court did acknowledge the proper legal standard, that it was the amended ADA. But he clearly didn't apply it. And you invited him to not apply it. Well, he went... He did go astray. But ultimately, this court's review is de novo. It's not bound by the district court's reasoning, and the court can affirm on any basis supported in the record. And so one of those bases for affirming is that even if... Well, you know, when we say that, we say that. And then other times we say, I think, more accurately, if it was raised below. Well, with respect, Your Honor, I think that that's traditionally in the case of arguments for reversal by an appellant. No, I don't think so. But go ahead. But in any case, any such impairment was transitory and minor. The statute defines transitory as having an actual or expected duration of six months. Here, there's no indication at all that Dealey or anyone else thought that the headaches and dizziness would persist for more than six months. And the impairment was minor because it didn't affect her ability to work or to do anything else affecting her daily life. So for that reason, too... You're going back to the old standard. Well, no, Your Honor. But what you just said does exactly go back to the old standard. Well, what the old standard is focusing on is a substantial limitation on a major life activity. What the new statute talks about is transitory and minor. Now, minor is not defined in the statute. But if it's to mean anything, it has to mean a disorder or condition that is minor, that doesn't have much of an effect. And here, that's all the evidence because she, again, worked without problems, could take care of herself, drove back and forth to work, et cetera. But it's broader than work, right? It's broader than work. I would think that minor means not having a meaningful effect on her life. And there's no evidence here that any impairment, and we think there was no impairment, but even if there was, had any effect that was more than minor. So on the pretext point, what distinguishes this case from the cases that Baker relies on in her briefing is that she doesn't contend that the school's examination of her teaching and the results of that inspection were trumped up or fake or anything like that. She doesn't dispute that at all. To the contrary, she has a documented history of performance problems and Dealey's write-up corresponded pretty closely to the history of performance problems. So what about several things? First of all, Dealey says, I heard concerns from students and parents about her performance, but he never names any of them or has any record of any of them. Is that right? Well, that's not in the record, Your Honor. Right. Well, I should say, and as you pointed out in opposing counsel's argument, there is a record in his declaration of specific concerns raised by different faculty members, but there isn't a documentation of every complaint. They keep repeating that parents and teachers were complaining. There's absolutely no documentation of it in the record. Not in this record on summary judgment. Then he told her that he was going to do this 2013 evaluation because it was catching up on his evaluations, but then he said in his declaration or deposition that it was because of these concerns. So he said two different things about why he would lie to her essentially about why he was doing it. Well, I would take issue with that he lied to her. Well, he didn't tell her the real reason, the reason he gave later. But I mean, the fact of the matter is his opposing counsel agreed, Dealey, as the principal of the school, had every right to be the one to observe her teaching. I understand that, but the question is why. In terms of pretext, if he says two different things about why he's doing it, that's some consideration. Is there any demonstration that a principal ever did these evaluations, her evaluations? Ever did her evaluations? I'm not aware of that in the record. All right, so that's unusual that the principal is walking in to do the evaluation. There was in fact no warning. I mean, it's odd because the whole evaluation reads as if he's going to continue her and he tells her she should work on this and work on that and then she walks in and he fires her. Well, it is written in the evaluation form that, you know... But it's also all this stuff about you should do this and you should do that. Well, that's true. I mean, it is an evaluation form and I think the goal is to... And with recommendations. Right, but it is on the face of the evaluation form saying, look, Michelle, you're an experienced teacher. These are problems that have been raised before with you. You haven't corrected them and your future at the school needs to be addressed. And the fact of the matter is this isn't a situation where the problems that Dealey was identifying in Baker's teaching had anything to do with her purported impairment. You know, quite the opposite. These problems not beginning the class with prayer, not controlling the classroom, getting a math problem wrong. Well, the second could and the third could. Well, that's speculation. Baker herself doesn't think that. Baker herself has testified uniformly that she doesn't think her teaching was affected by this at all. So again, the most that she has to support her pretext case at the end of the day is speculation. There's no direct evidence and the circumstantial evidence... I just gave you a list. Right, and I would... Not speculation. Those were objective facts. Right, but what those objective facts would show at most is that the record-keeping policies of the school maybe weren't ideal, but they don't show that Dealey's decision not to offer a new contract was the product of forbidden disability discrimination. Well, that's not the point. You mean no jury could... Correct. There's not enough evidence on this record to support the finding of pretext. So there's three distinct reasons... There's these other two other people who say that they became disabled or were impaired... Well, the Me Too declarations, Your Honor, are quite different, and I think no reasonable jury could rely on them. The Zlotinoff declaration says that she had a history of glowing performance reviews, then she ended up wheelchair-bound, and then was not offered a new contract. So here, by contrast, there's no history of glowing reviews. Other than I didn't mention that was said, I haven't checked it, was that she actually... The new evaluation was, in some respects, better than the ones that didn't lead to her discharge because she showed improvement in most of the areas. Well, I think this is covered in a lot of detail in the briefing, so while there might be... Well, okay, but you're standing here now. No, I understand, and what I wanted to say was that while certain areas might have differed a little bit, the big picture was really the same, that there were certain major glaring problems that were uncorrected, and those were problems having nothing at all to do with any purported discrimination, but they were problems that led Dealey to conclude that this teacher wasn't meeting expectations, that she had been given the opportunity to improve, and that she hadn't improved, and the school had every right not to offer her a new employment contract. So this court should affirm, because there was no perceived impairment, even if there was an impairment, it was transitory and minor, and in any event, there's no showing of pretext. So unless the court has any other questions, I'll submit. Okay, thank you. Thank you, Your Honors, and just briefly, on the transitory or minor issue, the statute says six months. The EEOC discussion regulations discussed in the amicus brief submitted by the EEOC say that that's meant to cover something like the cold, flu, I get pneumonia every other year, it knocks me out for four weeks, that sort of thing is transitory or minor. In this case, even if you take six months, your disability must last for six months. She became disabled on August 23rd, when she had the fall, and she was still having these problems, at least there's evidence to suggest, in February, which is coming close to, if not exactly, six months. I haven't done the exact math, so I don't think that's an issue. As far as, well, these problems were not affecting her teaching, that's kind of a catch-22. If her problems had legitimately been affecting her teaching so that she could not work, there might have been an argument that this would have been a legitimate reason she would no longer be able to fulfill her duties. So she's always maintained that she was able to fulfill her duties despite her disability, even if she had to overcome that. So that's not really an issue there. But the principal says, Julie says, that he knew she was seeing doctors, but didn't know that she was seeking for anything to do with the earlier fall. Your Honor, he does say that. I think that a reasonable jury could question the credibility of that. He's the principal. He's supposed to know what's going on. You have to submit, and he said he knew what was going on with his faculty. He knew she was out because they had to bring in a substitute to cover for when she was not there. The application for leave to take time off to go to these had to be approved by either an assistant principal or a principal. Does it have to say why she was going to the doctor? It says doctor's appointment. I'm not sure. They're in the record, actually, Your Honor, the request for leave. And I'm not sure whether they say exactly why. I think in one case she was going for whether it was a CAT scan or something like that. I do think it says specifically that that was the case. I think it defies logic to suggest that a competent principal doesn't know when his teachers are taking time off for doctor's appointments. And, again, he – He didn't say he didn't know. He didn't pay that much attention. But he said he didn't know why. He didn't know why except that, you know, she says, oh, I ran into him every week to 10 days or so, and I told him I was having these problems with dizziness, et cetera, et cetera, et cetera. And then, of course, there was the worker's compensation claim that was filed that could very well have come across his desk. Admittedly, I don't have evidence of that, but that's another credibility issue. It defies credibility that he didn't have at least some idea of what was going on. And he says, I knew she missed some faculty appointments, meetings. He filed for worker's comp, but he says he didn't know that. I see that he says that, Your Honor. I don't know how to explain that. The standard that counsel has suggested, as Your Honor points out, really tends to go back toward the old Sutton standard that's been discarded. Well, it wasn't affecting her at all. Well, I think the reason for the ADA amendments was precisely because we have conditions that people who are I think it was the Supreme Court case about the nearsighted pilots, the twin nearsighted pilots. Your Honor, I think we could spend a long time talking about whether or not we want our pilots to have really acute vision, although in this day and age with, I don't know, that's not this case. But all I'm saying is there are situations where people have health problems that do not affect their daily lives on a day-to-day basis, and yet other people regard them as suspect, as the word the kids would use is icky. People are afraid of people who have had cancer for no reason, and yet having had cancer is one of those things that many people would consider that they didn't want to have you around, they didn't want to hire you. And so the amendments were there, and the statute instructs we have to give this a very broad brush, precisely to protect people who may not be affected in their day-to-day lives, but who are the subject of prejudice because they're having a problem. Or it's perceived that you may have a problem somewhere down the road because of this, and I don't want you here. I either don't want you here because you make me feel icky, or because I think you're going to cost me more money down the road. Okay. Your time is up. Thank you. Thank both of you for your argument. The case of Baker v. Roman Catholic Archdiocese is submitted and we are in recess. Thank you.
judges: Berzon, Bybee, Woodcock